IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Civil Action No._____

*FILED WILLIAMSPORT SEP 16 2022 PER___ DEPUTY CLERK*

AHMAD M. AJAJ#40637-053,

v.                                                          **TRIAL BY JURY**

UNITES STATES OF AMERICA;
WARDEN HERMAN QUAY;
ASSOCIATE WARDEN PAUL GIBSON;
ASSOCIATE WARDEN TODD WERTMAN;
CAPTAIN MICHAEL HALL;
CHAPLAIN BRIAN CIESLUKOWSKI;
SIA SHANNON PRUTZMAN;
SIS Lt. S. VALENCIK;
SHU LT. NATHAN COOPER;
OFFICER W. PENSYL;
OFFICER TRAVIS RUNG;
DR. BRIAN BUSCHMAN;
AFSA JAMES SHAFFER;
OFFICER "FNU" LYNCH;
HSA MICHAEL MAGYAR;
P.A. SARA HERNANDEZ;
OFFICER CODY THOMAS WILLIAMS;
OFFICER JAIME C. FRIANT;
ACTING DHO GREGORY EASTON; and
DHO K. BITTENBEND;
**(ALL THE INDIVIDUAL DEFENDANTS ARE BEING SUED IN THEIR INDIVIDUAL CAPACITY)**

---

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff Ahmad M. Ajaj, pro se, herrby submits this complaint for violation of his Constitutional and Statutory rights by the above named Defendants.

-1-

## I. JURISDICTION AND VENUE

1. This Court possesses subject matter jurisdiction purusant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 1350, 2241, 2201, 2202, 42 U.S.C. §§ 1985, 1986, and 2000bb-1(c).

2. Venue is proper within this district pursuant to 28 U.S.C. § 1391 because substantial portion of the events giving rise to the claims occurred in this judicial district.

## II. PARTIES

3. Plaintiff Ahmad M. Ajaj#40637-053, is a federal prisoner in the custody of the United States Bureau of Prisons ("BOP") who was confind at USP-Allenwood from February 8, 2019 to September 27, 2021. He is currently incarcerated at USP-Coleman 1, P.O.Box 1033, Coleman, Florida 33521.

4. At all relevant times, the BOP staff described herein were acting within the scope of their employment with BOP and, as such, Defendant United States is the proper defendant under the Federal Tort Claims Act.

5. Defendant Herman Quay is the Complex Warden of FCC-Allenwood, P.O.Box 3000, White Deer, PA 17887.

6. Defendant Paul Gibson is an Associate Warden of FCC-Allenwood, P.O.Box 3000, White Deer, PA 17887.

7. Defendant Todd Wertman is an Associate Warden of USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

8. Defendant michael Hall is a Captain of USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

9. Defendant Brian Cieslukowski is the Supervisory Chaplain for FCC-Allenwood, P.O.Box 3000, White Deer, PA 17887.

10. Defendant Shannon Prutzman is the Special Investigative Agent (SIA) of USP-Allenwood, P.O.Box 3000, PA 17887.

11. Defendant S. Valencik is the SIS Lieutenant of USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

12. Defendant Nathan Cooper is the Special Housing Unit Lieutenant of USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

13. Defendant W. Pensyl is a correctional officer at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

14. Defendant Travis Rung is a correctional officer at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

15. Defendant Brian Buschman is a medical officer at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

16. Defendant James Shaffer is an Assistant Food Services Administrator at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

17. Defendant "FNU" Lynch is a correctional officer at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

18. Defendant Michael Magyar is a health services administrator at FCC-Allenwood, P.O.Box 3000, White Deer, PA 17887.

19. Defendant Sara Hernandez is a physician assistant at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

20. Defendant Cody Thomas Williams is a correctional officer at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

21. Defendant Jaime C. Friant is a correctional officer at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

22. Defendant Gregory Easton is an acting Disciplinary Hearing Officer (DHO) at USP-Allenwood, P.O.Box 3000, White Deer, PA 17887.

23. Defendant K. Bittenbend is the Disciplinary Hearing Officer (DHO) at FCC-Allenwood, P.O.Box 3000, White Deer, PA 17887.

### III. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (RFRA, 42 U.S.C. § 2000bb violations)

**a. Failure to Accommodate Religious Fasting:**

24. Plaintiff Is a devout Muslim. His religious beliefs have been constant and unwavering throughout his life, including his years spent incarcerated.

25. Plaintiff's years of administrative remedies filed in an effort to observe his religious faith demonstrate his firm belief in Islam.

26. BOP's annual "Inmate Skills Development Plan" for Plaintiff consistently identifies him as an "active participant" of the Islamic faith.

27. Chaplain Sacchorello, ADX Chaplain, confirmed in writing that Plaintiff is sincere in his religious beliefs.

28. The U.S. Attorney for the BOP in Ajaj v. Federal Bureau of Prisons, et. al., Civil Action No. 1:15-cv-00992-RBJ-KLM (D.Colo.), admitted in that the Plaintiff is sincere in his religious beliefs.

29. The Five Pillars of Islam are acts that observant Muslims are required to perform and are the basic foundations of the Islamic religion.

30. Fasting is one of the Five Pillars of Islam.

31. Ramadan is a holy month which Muslims must fast daily from dawn to sunset. During the day, no eating or drinking is allowed.

32. During Ramadan, a Muslim must also adhere strictly to the moral code, as failure there is considered to be a violation of the requirements of fasting.

33. For sincere believers Ramadan is seen as a test of devotion, in which physical endurance mirrors the inner spiritual state a believer constantly strive to improve.

34. The sacrifices associated with fasting are designed to instill discipline, heighten awareness of religious duty and dependence upon Allah, and be reminded of the hunger associated with being poor. During this month, those who have been materially blessed are able to be very generous to those who have little or nothing.

35. In order to observe the fast, Muslims must not ingest any medications from dawn until sunset, as long as taking those medications outside of fasting hours will not have an adverse effect on their health.

36. Like all observant Muslims, Plaintiff is required to fast during Ramadan.

37. In order to observe the fast during Ramadan, Plaintiff is prohibited by his religious faith from igesting any food or prescribed medications from dawn until sunset.

38. The BOP Guidelines for Ramadan states "If a Muslim inmate requests to be allowed to take pills and receive injections at an alternative time, so as to not conflict with daytime Ramadan fast, such a request should be accommodated. Ingesting anything from dawn to sunset, including medicine, invalidates the day of fasting during Ramadan".

39. BOP regulations provide that "the warden shall endeavor to facilitate the observance of important religious days which involve special fast, dietary

-4-

regulations, worship, or work proscription." 28 C.F.R. § 548.18.

40. Consistent with BOP policy, Plaintiff requested his prescription medications be delivered to him outside fasting hours in order to fully observe the fast during Ramadan 2019.

41. Prior to ramadan, Defendants Gibson, Magyer, Buschman, and Cieslukowski spoke with the Plaintiff and assured him that his morning medications (Modafinil and Wellbutrin) would be delivered to him daily before dawn during Ramadan to allow him to fast.

42. When Ramadan started, the Defendants changed their mind and told the Plaintiff that his morning medications would be served to him during the fasting hours.

43. When the Plaintiff refused to take his medications during the fasting hours, Defendant Buschman with the approval of the other Defendants, cancelled Plaintiff's medication (Modafinil) permanently and suspended Wellbutrin during the month of Ramadan.

44. Modafinil was prescribed to Plaintiff by specialist after all other medications failed to improve his Chronic fatigue Syndrome during years of failed treatment. Modafinil significantly improved Plaintiff's CFS symptoms and helped with his apnea symptoms.

45. Prior to Ramadan, Defendant Buschman repeatedly renewed Plaintiff's Modafinil medication because it was proven to be effective treatment for Plaintiff's medical conditions.

46. Both Modafinil and Wellbutrin should not be discontinued suddenly without gradual reduction but Defendant Buschman suddenly discontinued both medications for non-medical reasons and without performing any evalution of Plaintiff's medical conditions prior to cancelling and suspending his prescribed medications, which both were prescribed by specialists.

47. Then, Defendant Buschman fabricated medical notes regarding the discontinuing Plaintiff's medications to make it sound that his decision to suddenly discontinuing the medications was based on medical judgment.

48. In Wall v. Buschman, 639 Fed. Appx. 92 (3d Cir., Dec. 22, 2015), the Third Circuit Court of Appeals questioned the honesty of Dr. Buschman by stating: ("Dr. Buschman's main response is that, even if he had known about a recommendation for a lower bunk on January 31, 2012, he need not have acted on it because it was only advice, and because Wall's primary-care provider would eventually

have seen the paperwork to act on it later. That is in tension with Dr. Buschman's statements in support of summary judgment. Dr. Buschman appears to argue both that he never knew about the neuralogist's recommendation until February 17, 2012, but also that he exercised his medical judgment in not following that advice on January 31, 2012. It is hard to see how Dr. Buschman can be said to have exercised 'judgment' concerning circumstances about which he disclaims knowledge ... Moreover, the record contains evidence that could support an inference that the decision to deny a lower bunk was made for non-medical reasons, which also undermines Dr. Buschman's arguments in favor of summary judgment").

49. Defendant Buschman exhibited a pattern of fabricating medical notes in Plaintiff's medical records, providing statements under the penalty of perjury in one of the Plaintiff's cases which were deliberately false and inconsistent with the results of diagnostic tests, and cancelling medical orders issued by other physicians and specialists related to Plaintiff's medical needs to inflict pain and suffering upon the Plaintiff for prejudicial reasons toward him and his Islamic faith.

50. While Plaintiff was housed at ADX-Florence and USP-Terre Haute, Plaintiff was served his medications before dawn and after sunset during Ramadan and his medications were never cancelled nor suspended to avoid accommodating his Ramadan fast.

51. At no time, the Defendants provided any legitimate or compelling government interest that would justify their denial of Plaintiff's request to respect his religious exercise.

52. Forced with a Hobson's choice of observing his **religion or** taking his medication, Plaintiff chose to observe his religion and was therefore forced to forego taking his necessary medications.

53. After the sudden cancellation of his medication (Modafinil) and the suspension of his medication (Wellbutrin), without gradual reduction of the doses as medically required, Plaintiff suffered from numerous symptoms such as uncontrolled agitation and irritability, racing thoughts, headaches, weakness, pain, increased fatigue, unrefreshing sleep, fog brain, short-term memory problems, nervousness, depression, anxiety, and lack of wakefulness.

54. Plaintiff reported his symptoms to Defendants Buschman, Magyar, Gibson, and others but they refused to take any corrective action.

55. To this present day, Plaintiff is being denied the only medication (Modafinil)

that alleviated his Chronic Fatigue Syndrome and apnea symptoms due to Defendant Buschman's cancelling of this non-formulary medication.

56. During the period between May, 2019 and September, 2021, Plaintiff repeatedly asked Defendant Buschman to reinstate his (Modafinil), which was prescribed by specialits but he refused to do so and blocked other medical staff from taking any action to resinstate it.

57. Plaintiff repeatedly requested, both verbally and in writing, that Defendants Quay, Gibson, Wertman, and Magyar direct Defendant Buschman to reinstate (Modafinil) but they refused to do so.

58. During the holy month of Ramadan, Muslims are required to perform congregate Tarawih night prayer.

59. Defendants Quay, Gibson, Wertman, Hall, and Cielukowski prevented Plaintiff and other Muslims at USP-Allenwood from performing the nightly Tarawih prayer during 2019, 2020, and 2021 Ramadan.

60. Consuming non-halal foods invalidates the Islamic fast and other worship acts for (40) days according to the Islamic faith.

61. Defendants Quay, Gibson, Wertman, Cieslukowski, and Shaffer denied Plaintiff's repeated requests to be served with halal meals complies with his sincerely held dietary laws while he was housed at USP-Allenwood from February, 2019 to September, 2021 including during Ramadan fast for those years.

62. Defendants Quay, Gibson, Wertman, and Cieslukowski denied Plaintiff's repeated requests to be allowed to purchase Halal food items with his own money while he was housed at USP-Allenwood from February, 2019 to September, 2021, including during Ramadan for those years.

63. Plaintiff sincerely held religious beliefs requires him to perform Sunnah during certain religiously important days.

64. Like Ramadan, the Sunnah fasts require Muslims not to ingest any food from dawn until sunset.

65. In order to observe the Sunnah Fasts, Muslims also must not ingest any medications from dawn until sunset, so long as taking those medications outside of fasting hours will not have an adverse effect on their health.

66. Plaintiff repeatedly explained to Defendants Quay, Gibson, Wertman, Hall, Buschman, Magyar, and Shaffer that Prophet Mohammed (PBUH) preaches that Muslims will be rewarded and blessed by Allah for their participation in the Sunnah fast.

67. From February 2019 to September, 2021, Defendants Quay, Gibson, Wertman, Hall,

-7-

Buschman, Magyer, and Shaffer denied Plaintiff's requests to accommodate his Sunnah fasts by ensuring that he would be provided halal and his prescribed medications before dawn and after sunset.

**b. Defendants Unjustifiably Prevented Plaintiff From Maintaining a Halal Diet that Comply with his Medical and Religious Dietary Restrictions:**

68. As a devout Muslim, Plaintiff is required to consume only halal drink and food items, including halal meat products, that fully complies with his sincerely held dietary laws.

69. Islamic doctrine dictates that non-halal (haram or "forbidden") food and haram products destroys the spirituality and morality of the Muslim consumer. A Muslim who is knowingly consumes non-halal food or product is termed a "fassiq" (dissolute) and he is considered a flagrant sinner. The prayers of a person who knowingly consume haram food are ineffective and not accepted by Allah for forty days.

70. The Qur'an states "so eat [halal] meats on which Allah's name has been pronounced", "do not eat anything over which Allah's name has not been mentioned; it is so immorall", and "O belivers: Eat from the pure things provided to you".

71. The life of a Muslim revolves around the concept of halal (Islamically lawful). A Muslim must earn income from halal sources, be involved only in halal transactions and consume halal food and drink.

72. To meet the requirements of a halal meat, the meat must come from an animal or a bird that was fed vegetarian diet only (no protein supplements, hermons, steroids, anti-biotic, etc.), and raised and slaughtered according to the Islamic dietary laws.

73. It is not permissible to consume even non-meat products in factories that alos process pork or non-halal products or to consume vegetables or fruits grown in farms that also raises hogs or uses hogs' waste as a fertilizer.

74. All ingredients for food or drink must be halal. Items used in preparing haram foods can contaminate halal foods, thereby making those food haram (prohibited) for Muslims to consume.

74. Not only all the ingredients for food or drink must be halal, but also the processing aid must be halal source. For example, the FDA regulations

-8-

do not require that the processing aid be mentioned in the ingredient statement.

75. A practicing Muslim should avoid consuming anything that Islamically considered Mash-booh (suspected). Some food or drink items are suspected because a Muslim may not know whether they are halal or haram. For example, during the processing of apple juice gelatin is used to clarify the juice. This gelat- could be from pork and then this apple juice becomes haram.

76. Any food or drink which is not recommended to eat or drink could be considered Islamiccally Makrooh (hated or discouraged). The concept of Makrooh is used in Islamic jurisprudence for any food, liquid, or smoking which is disguised or harmful to the body physically, psychologically, mentally or spiritually.

77. The religious diet of Islam includes meat; not a strict vegetarian diet. Prophet Mohammad (PBUH) prohibited Muslims from declaring that their religious diet is vegetarian, and he said "he who does not eat [halal] meat is not of my religion."

78. Plaintiff believes that to fully observe the Islamic dietary laws, he must consume or purchase a completely halal diet with halal meats.

79. Plaintiff's sincerely held religious beliefs also forbid him from consuming or purchasing halal food or drink that was obtained from a vendor that deceived Muslims by misbranding his products as halal even if that vendor is a Muslim vendor.

80. Plaintiff also religious prohibited from consuming or purchasing products from a vendor selles idols, swine, alochol or Islamically prohibited products.

81. Plaintiff believes that he must consume or purchase halal products from a trustworthy Islamic source or vendor. A mere log or symbol on a wrapper does not render the product halal. Mislabeling or misbranding products as halal has been proven to be a perennial problem. Furthermore, many of the Halal Certifiers are untrustworthy and very unscrupulous.

82. Plaintiff has documented medical conditions, acknowledged by numerous BOP and outside medical professionals, which require him to avoid certain foods.

83. Shortly before the BOP transferred Plaintiff to USP-Allenwood, the Clinical Director at FCC-Terre Haute Dr. William Wilson updated Plaintiff's medical diet status to reflect clearly the restrictions placed on his diet. In his

updated medical diet status, Dr. Wilson stated that "Central office dietician recc. Low fat diet. No milk/cheese products. No cereals, soy, cooked grains. No PB, processed meat, vegetable, caffeine. Baked instead of fried foods. White bread-not wheat".

84. Upon Plaintiff's arrival to USP-Allenwood, Defendant Buschman cancelled Dr. Wilson's medical order to unlawfully inflict pain and suffering upon the Plaintiff for non-medical reasons and religious prejudice toward the Plaintiff and his Islamic faith.

85. Defendant Buschman also defied medical dieary orders by other physicians and a specialists related to Plaintiff's medical conditions.

86. More importantly, Defendant Buschman conspired with others, including attorneys representing the BOP in another case, by fabricating statements under the penalty of perjury to deprive Plaintiff of halal diet consistent with his medical needs.

87. During the period between February 8, 2019 and September 27, 2021, Defendants Quay, Gibson, Wertman, Cieslukowski, Buschman, Shaffer, and Magyer denied Plaintiff's repeated requests for halal diet that consistent with his sincerely held religious beliefs and medical dietary restrictions to inflict pain and suffering upon him and to force him to betray his Islamic dietary laws.

88. During the period between February 8, 2019 and September 27, 2021, Plaintiff was forced to reject all his pre-packaged meals, which inconsistent with both his religious and medical dietary restrictions, and he was left with almost nothing to eat from the Food Services due to Defendants' unlawful actions and religious prejudice toward him.

89. On March 27, 2019, Defendant Shaffer conspired with others, including attorneys for the BOP in another case, by submitting a declaration under the penalty of perjury that deliberately contained fabricated statements for the purpose of depriving him of halal diet that consistent with his religious dietary laws and medical dietary restrictions and to prejudice the court against him.

90. Shortly after the Plaintiff became aware of the fabricated statements under the penalty of perjury by Defendant Shaffer, he requested both verbally and in writing that Defendant Prutzman review and preserve all the video recordings and the scanning data,and not to destroy or erase them, of the chow hall that

-10-

proves that the prejudicial statements were fabricated.

91. Plaintiff repeatedly asked Defendants Quay, Gibson, Wertman, Prutzman, and others to take proper actions to notify the Judge in another case that the video recordings and the scanning data proved that the prejudical statements by Defendant Shaffer, which the court used in denying Plaintiff halal diet consistent with both his religious dietary laws and medical dietary restrictions, were fabricated, but the Defendants refused to do so due to their own prejudice toward Plaintiff and his Islamic faith.

92. From April 7, 2019 to at least September, 2020, Defendants Quay, Gibson, Wertman, Cieslukowski, Buschman, Shaffer, and Magyer took actions to enforce on the Plaintiff prepackaged meals that were haram (religiously prohibited for him to consume) because they were made by a company that decieved Muslims and found guilty,with its halal certifier,of misbranding its products as halal, and they refused to serve him a readily available foods that complies with his religious and medical dieatry restrictions in violation of RFRA and the Establishment Clause of the First Amendment. See, **United States v. Aossey**, 854 F.3d 453 (8th Cir. 2017).

93. Since at least 2017, the BOP was aware that any food item made by Midamar Corporation, which was convicted of labeling items as halal when in fact they were not, are haram (religiously prohibited) for the Plaintiff to consume under his sincerely held religious dietary laws.

94. Faced with a Hobson's choice of observing his religion or consume haram meals, Plaintiff chosed to observe his religion and was therefore forced to forego taking his prepackaged meals.

95. From February 8, 2019 to September 27, 2021, Defendants Quay, Gibson, Wertman, Cieslukowski, and Shaffer imposed on the Plaintiff halal standards that violates his religious dietary laws in violation of RFRA and the Establishment Clause of the First Amendment.

96. On or about September, 2020, Plaintiff found out from other fellow inmate that the pre-packaged meal options were changed to incorporate Labriute Meals, a company which purports to produce and serve halal foods.

97. Plaintiff was informed that Labriute meals have been certifies as halal by the Islamic Institute of Minnesota.

98. Prior to September 20, 2020, Plaintiff had not heard of either Labriute, nor the Islamic Institute of Minnesota.

-11-

99. As a result of his experiences with Defendants' previous vendor, Plaintiff once again feared that food provided to him by Defendants would violate his religious requirements of halal foods.

100. For several months after receiving notice that Labriute meals is the halal food vendor selected by Defendants, Plaintiff attempted to obtain information about Labriute and it is halal certifier the Islamic Institute of Minnesota from Defendants Quay, Gibson, Wertman, Cieslukowski, Shaffer, and other other BOP officials to find out if the meals complies with his sincerely held religious dietary laws.

101. Plaintiff asked the Defendants to call LaBriute Meals company and its Certifier to find out the necessary information to enable him to determine if the meals complies with his sincerely held religious dietary laws, but they refused to do so and instructed him to seek confirmation on his own as to whether the meals complies with his sincerely held dietary laws.

102. On January 3, 2021, Plaintiff complied with Defendants' insistence that he obtain the confirmation on his own by sending a text to Labriute's halal certifier with eight questions related to the meals and the halal standard that was applied to certify them as halal. (see, Ex. 1).

103. Defendant Valencik, which reviews all of Plaintiff's correspondence and communications, approved and forwarded the text.

104. Defendant Valencik's responsibility to reject any email or text that violates Bureau of Prisons' rules or regulations.

105. On February 24, 2021, seven weeks after Defendant Valencik approved the the text to the halal certifier issued a Code 299 ("disruptive conduct") incident report to Plaintiff for allegedly "circumventing monitoring procedures" by sending the approved text to the halal certifier by utilizing the approved text forwarding service.

106. Defendant Valencik singled out for disciplinary incident report only the text to halal certifier, which contained no prohibited information, and he never issued any disciplinary incident report for other text messages sent by Plaintiff for non-religious matters.

107. Prior his disciplinary incident report, Plaintiff regularly used the text forwarding service for six months without any incident, with the approval and knowledge of Defendant Valencik, like many other Allenwood and thousands of BOP inmates.

-12-

108. For months prior to January 3, 2020 text to the halal certifier, Defendants Valencik, Quay, Gibson, Wertman, Hall, and Prutzman tooke several steps that indicated Plaintiff's use of the text forwarding service in this manner was acceptable: They approved Plaintiff's request to add the text forwarding service company  to his contact list; they approved his request to send the company money; for months forwarded all Plaintiff's messages from and to the company; they  never posted a notice to inmates that text forwarding services were prohibited; they allowed Plaintiff to review emails from at least four different text forwarding services explaining their serives and offered him free trial; and they never warned the Plaintiff that using text forwarding services was unauthorized.

109. To this present date, there is no disciplinary rule that explicitly prohibits the use of text forwarding services.

110. Furthermore, the use of the text forwarding services does not circumventing the monitoring procedures of the Plaintiff's communications because all his emails and texts are monitored by using his inmate's register number, which enables Defendant Valencik to review his communications and electronic messaging, including electronic messages from and to the text forwarding services.

110. Few years ago, the Bureau of Prisons' Counter Terrorism Unit Supervisor issued a report regarding Plaintiff's communications stating that he "has not demonstrated a concern regarding his communications with the community."

111. On February 24, 2021, the same day the disciplinary incident report was issued against the Plaintiff, Defendants Quay, Wertman, Hall, Prutzman, and Valencik ordered the placement of the Plaintiff in the Special Housing Unit "the Hole" for retaliatory and religious hatred toward Plaintiff and his Islamic faith.

112. Inmates who received much more serious disciplinary reports were kept in the general populations. For example, on or around May, 2021, two inmate received code 297 (circumventing telephone monitoring procedures and using another inmate's PIN number), were kept in the general population despite having serious disciplinary records.

113. Upon information and beliefs, Defendant Bittenbend conspired with others to find Plaintiff guilty of the Incident Report issued by Valencik and to impose severe punishment on him that out of all proportion to the alleged violation.

-13-

114. On March 8, 2021, Defendant Bittenbend sanctioned Plaintiff with 60 days disciplinary segregation, 18 months without visit, 18 months without phone, 18 months without email, and 27 days loss of earned good conduct time for approved text to LaBriute's halal certifier seeking confirmation that meals served to him complies with his sincerely held religious dietary laws.

115. Bureau of Prisons Program Statement 5270.09, states that the loss of electronic messaging privileges is an appropriate sanction for violations of electronic messaging policy.

116. Other non-Muslim prisoners received far less punishment for much severe violations of the BOP disciplinary rules. For example, Discipline Hearing Officers sanctioned for Code 110 (refusing to provide a urine sample) 41 days' disallowed good conduct time and 120 days' loss of visiting and commissary (no disciplinary segregation was imposed). For 297 code violation (circumventing telephone monitoring procedures), the DHO sanctioned the inmate with 90 day without telephone and nothing else. For Code 113 violation (possession of drugs), the sanctions imposed were 21 days disciplinary segregation and a one year loss of visiting and phone privileges. For 112 violation (use of narcotic), the DHO sanctioned the inmate with 30 days of disciplinary segregation, and loss of phone, visitation, and contact visitation privileges for 8 months despite that inmate has a lengthty of serious disciplinary records history. For Code 108 violation (possession of cellular phones), the DHO sanctioned the inmate with disallowance of (40) day of good conduct time, (30) days of disciplinary segregation, and (12) months' loss of email privileges and nothing else.

117. Plaintiff was subjected to disciplinary actions due to Defendants refusal to provide him with the necessary information on the pre-packaged meals on his diet and for following their instruction to obtain the information on his own.

118. As a direct result of Plaintiff seeking confirmation as to LaBriute's ability to provide halal food complies with his sincerely held religious beliefs, Defendants Quay, Wertman, Hall, Cieslukowski, Prutzman, Cooper, and Bittenbend refused to allow Plaintiff to call, or otherwise hear the voice of, his dying mother during her final moments at the hospital, causing Plaintiff to undergo extreme psychological stress and turmoil.

-14-

119. From February 2019 to September, 2021, Defendants Quay, Gibson, Wertman, Hall, Cieslukowski,Buschman, Magyar, and Constant refused to take any action to ensure that the Plaintiff be allowed to purchase halal food items, that comply with his sincerely held dietary laws and medical restrictions, with his own money.

**c. Defendants Unjustifiably Prevented Plaintiff's Access to An Imam or A Muslim Chaplain:**

120. As a devout Muslim, Plaintiff must meet regularly with an Imam.

121. Islamic law mandates regular consultation with an Imam to ensure compliance with religious values in daily life.

122. An Imam is the primary Islamic religious leader who leads others in formal prayers, outlines lessons from the Qur'an by explaining its meaning and application in the daily life of Muslims, give advice and counseling on personal, family, and financial issues, helps life of Muslims, give advice and counseling on personal, family, and financial issues, helps Muslims apply the rules of Islam to daily life, and builds Muslim community and followship.

123. BOP policy on Religious Beliefs and Practices states "the institution's chaplain may contract with representatives of faith groups in the community to provide specific religious services which the chaplain cannot personally deliver due to, ordinarily, religious prescriptions or ecclesiastical constraints to which the chaplain adheres." BOP Prog. Statement P5360.09.

124. The BOP Technical Manual on Ministry of BOP Chaplains states: "chaplains will recruit and use contractors and volunteers to meet the religious needs of inmates." BOP Tech. Man. T5360.02.

125. As discussed below, Defendants Quay, Gibson, Wertman, and Cielukowski failed to follow and repeatedly violated BOP's own policies and procedures with respect to provided Plaintiff access to an Imam or Muslim Chaplain.

126. From February 8, 2019 to September 22, 2020, Plaintiff had no interaction with an Imam, except twice with a Muslim Chaplain for approximately a total of 30 minutes or less.

127. From February 8, 2019 to September 27, 2021, there had been no approved religious Sunni Muslim volunteers at USP-Allenwood.

128. From February 8, 2019 to September 22, 2020, Defendants Quay, Gibson, Wertman, and Cielukowski denied Plaintiff's repeated requests to be provided

regular access to an Imam or a Muslim Chaplain by any means, including phone calls to or video visits with an Imam or a Muslim Chaplain without any legitimate justification.

129. From February 8, 2019 to September 27, 2021, Plaintiff was allowed to pray with an Imam (Muslim Chaplain) only three or four times; each for less than five (5) minutes.

130. From February 8, 2019 to September 27, 2021, the Defendants denied Plaintiff any meaningful access to an Imam or a Muslim Chaplain.

131. On or around September 20, 2020, USP-Allenwood hired a full-time a Muslim Chaplain.

132. The Muslim Chaplain was assigned to accommodate all religious groups needs at USP-Allenwood.

133. From February 24, 2021 to September 27, 2021, Defendants Quay, Gibson, Wertman, Hall, Cieslukowski, and Cooper denied Plaintiff's repeated requests to perform any prayer with the Muslim Chaplain.

134. The Defendants also denied Plaintiff's repeated requests to have access to the Muslim Chaplain in a quiet or more private setting than behind solid steel door in a very noisy range.

135. From February 24, 2021 to September 27, 2021, Plaintiff was allowed to only speak to the Muslim Chaplain behind a solid steel door in a very noisy housing range, which deprived him any meaningful access to a Muslim Chaplain.

136. Due to a serious medical condition, Plaintiff has only one lung. This severely limits his ability to communicate loudly without pain and breathing problem. All the Defendants were aware of Plaintiff's medical conditions, yet made no effort to accommodate him during religious visits.

137. Defendant Bittenbend directed the Muslim Chaplain not to visit Plaintiff in the Special Housing Unit for few weeks in violation of Plaintiff's religious rights.

138. Prior to the Plaintiff's transfer out of USP-Allenwood, Plaintiff repeatedly requested, verbally and in writing, that Defendants Quay, Wertman, Hall, and Cieslukowski recommend that the he be designated to institution has Imam or a Muslim Chaplain, but they refused to do so.

139. Due to their refusal, Plaintiff was designated to USP-Coleman, which has no Imam or a Muslim Chaplain.

140. Due to Defendants' refusal to recommend that the Plaintiff be transferred

-16-

to institution has Imam or a Muslim Chaplian, since September 27, 2021 Plaintiff provided no access at all to an Imam or a a Muslim Chaplain.

**d. Defendants Unjustifiably Prevented Plaintiff from Performing His Daily Prayers in the manner Required by His Sincerely Held Religious Beliefs:**

141. Salaat, or prayer, is one of the Five Pillars of Islam.

142. Muslims must perform Salaat five times daily at specific times.

143. The Prophet Mohammed directed the Muslims to perform their daily prayers with other Muslims and told Muslims that Allah rewards those who pray in groups during Salaat.

144. Plaintiff firmly believes that Allah punishes those who fail to participate in congregational prayers and rewards those who do.

145. Each prayer takes approximately five to ten minutes to complete.

146. Each Friday between noon and the mid-afternoon prayer, Muslims are obligated to partake in congregational prayer, or Jum'ah.

147. While Plaintiff was housed at USP-Allenwood, Defendants Quay, Gibson, Wertman, Hall, Cieslukowski, Prutzman, and Cooper refused to accommodate daily congregational prayers in the manner required by his sincerely held religious beliefs.

148. While Plaintiff was housed at USP-Allenwood, the Defendants refused to accommodate even individual prayers in the manner required by his sincerely held religious beliefs.

149. The Defendants also refused to provide religiously suitable area to perform the daily congregational prayers in the manner required by the Plaintiff's sincerely held religious beliefs.

150. Because Defendants Gibson, Hall, Cieslukowski, and others refused to accommodate Plaintiff's daily prayer in the manner required by his sincerely held religious beliefs, on March 10, 2019, Plaintiff declared a hunger strike to protest the Defendants' refusal to accommodate his prayers. I have never had to go on a hunger strike before just to perform my obligatory prayer.

151. On September, 2020, Plaintiff declared a hunger strike again because Defendants Quay, Gibson, Wertman, Hall, Cieslukowski, and Prutzman refused to accommodate his daily obligatory prayers and rituals.

152. On September 21, 2020, Defendants Quay, Gibson, Wertman, and Prutzman punished Plaintiff with disciplinary action and placed him in the Special Housing Unit for requesting to be assigned to a cellmate or a cell where he could perform his daily prayers.

153. While Plaintiff was housed in the Special Housing Unit from February 24,

2021 to September 27, 2021, Plaintiff was deprived of access to his prayer rug, prayer oil, watch to know the time for performing the daily prayers, and other religious materials by Defendants Quay, Wertman, Hall, Cieslukowski, and Cooper.

154. From February 24, 2021 to September 27, 2021, Defendants Quay, Wertman, Hall, Prutzman, Valencik, Cooper, Easton, Bittenbend, and Pensyl deprived Plaintiff from performing any congregational prayer, Jum'ah prayer, Tarawih prayer, Eid prayer, or anyother prayer in the manner required by his sincerely held religious beliefs due to their unlawful actions against the Plaintiff.

155. Defendants Quay, Wertman, Hall, Cieslukowski, Prutzman, Valencik, and Cooper refused to take any action to prevent Pensyl, Rung, Lynch, Williams, and Friant from their religious abuses of the Plaintiff, including repeatedly disrupting his daily prayers, and deliberately harassing him while performing his daily prayers.

**e. The Defendants repeatedly allowed or subjected Plaintiff to strip searches that violates his sincerely held religious beliefs:**

156. The government impermissibly burdens religious exercise if it requires participation in an activity prohibited by sincerely held religious belief or places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief.

157. A policy made an inmate to choose between following it or following his religion, it substantially burden his religious exercise.

158. Courts consistently find unconstitutional those regulations that exempt secular conduct but do not exempt similar religious conduct.

159. Consistent with the Qur'an and the Hadith of the Prophet Mohammed, one of Plaintiff's sincerely held religious beliefs is that it is a grave sin for a Muslim man to strip or expose himself to anyone but a spouse, medical treatment, or other circumstances of necessity.

160. The Bureau of Prisons Program Statement 5200.04, Transgender Offender Manual, states that "institutions should consider available body scanning technology in lieu of visual searches of transgender inmates".

161. The BOP Officials at the Supermax Penitentiary (ADX) granted exemptions from visual strip searches to other inmates under the Special Administrative Measures (SAM) for religious reasons after they installed a full-body scanner at the High Security Unit (H-Unit) at ADX.

162.28 C.F.R. § 552.11, states that "inspection of an inmate's person using electronic devices (for example, Metal Detector, Ion Spectrometary device, or

body imaging search device) does not require inmate to remove clothing".

163. Defendants Quay, Gibson, Wertman, Hall, and Cooper, Pensyl, Rung, Lynch, Williams, and Friant repeatedly denied Plaintiff's requests to be exempt from strip searches and instead be searched via the readily available metal detector and/or the full body scanning machine to accommodate his sincerely held religious religious beliefs.

164. On many occasions while housed at USP-Allenwood, Plaintiff was subjected to two strip and body cavity searches during one movement and despite the fact that he was under constant supervision and physical control by the BOP staff at USP-Allenwood, including by Defendants Cooper, Pensyl, Rung, Lynch, Williams, and Friant.

165. More importantly, Defendants Cooper, Pensyl, Rung, Lynch, Williams, Friant, and others repeatedly subjected Plaintiff to strip and visual body cavity searches even when the pat search, the metal detector search, and/or the full body scanner revealed no contraband of any-kind.

166. During his approximately (30) years confinement, Plaintiff never concealed any contraband or weapons to justify humiliating and demeaning strip and visual cavity searches that violates his sincerely held religious beliefs.

167. On many occassions, Defendants Cooper, Pensyl, Rung, Lynch, Williams, Friant, and others made sexual ribald comments and religiously offensive remarks toward the Plaintiff and physically abused him.

**f. Defendants singled out the Plaintiff for harsh treatment and abuses due to hatred toward him and his Islamic faith:**

168. While Plaintiff was housed at USP-Allenwood, Plaintiff was subjected anti-Muslim harassment, physical abuses, and mistreatment, which includes the violations stated in all pervious paragraphs.

168. While Plaintiff housed at USP-Allenwood, he was forced to declare prolonged hunger strikes to protest his mistreatment, physical abuses, and violations of his basic human and religious rights by the Defendants that were motivated by their hatred toward the Plaintiff and his Islamic faith as expressed by them through their words and/or actions.

169. During the COVID-19 pandemic, Defendants Quay, Gibson, Wertman, Hall, Prutzman, Cielslukowski, Valencik, Cooper, Pensyl, Rung, Lynch, Magyer, Williams, Friant, Easton, and Bittenbend forced the Plaintiff to declare a prolonge hunger strikes to protest the violation of his basic religious and human rights despite the fact that all of them were aware that the Plaintiff has severe well-documented

-19-

underlying medical conditions that placed him at extreme risk of death or severe health complications if he were to contract the virus.

170. Plaintiff suffers from astma, apnea, high blood pressure, GI diseases, a history of tuberculosis exposure and lung cancer, and he has only one lung.

171. During COVID-19 pandemic, Defendants Quay, Gibson, Wertman, Magyer, and Buschman denied Plaintiff's and his lawyers' request that the Defendants take proper protective actions to minimize his exposure to COVID-19  for no legitimate reasons, other than their hatred toward Plaintiff and his Islamic faith.

171. When Plaintiff sent emails to his lawyers and others and others about the serious violations of COVID-19 mitigation guidelines by the Defendants and USP-Allenwood staff, Defendants Quay, Gibson, Wertman, Hall, and others retaliated against the Plaintiff by expelling him from the Challenge Program, single cell assignment, place to perform his daily prayer, placed with him a cellmate who was infected of COVID-19 and shortly after Plaintiff was tested positive of COVID-19 and suffered serious health problems, and moved him from Unit with less inmate population than all other general population to a crowded unit that had the highest number of COVID-19 infections.

172. Plaintiff repeatedly complained to Defendants Quay, Gibson, Wertman, Hall, Prutzman, Buschman, and Magyar about the defiance of the COVID-19 mitigation guidelines but instead of taking corrective actions, they retaliated against the Plaintiff and punished him severly. (See, Ex. 2).

173. On or around November 20, 2020, Plaintiff was infected after his cellmate was tested positive.

174. During his infection, Plaintiff was deprived of medical care and medications to treat his serious symptoms.

175. Plaintiff suffered from chills, coughing, loss of sense of smell and taste, chest pain, shortness of breath, pain, weakness, fatigue, fog brian, loss of appetite, sore throat, weakness, loss of hearing in one of his ears for a period of time, sore throat, numbness on his his face, and other symptoms.

176. Plaintiff is still suffering from Post-COVID symptoms and health problems. The infection also caused serious damage to Plaintiff's heart, which includes severly hypokinetic.

177. From February 24, 2021 to September 27, 2021, Defendants Cooper, Pensyl, Rung, Lynch, Williams, Fraint, and other SHU staff, with approval of Defendants Quay, Wertman, Hall, and Prutzman, deliberately inflicted pain and suffering

on the Plaintiff and deprive him of the ability to practice his religion in the manner required by his sincerely held religious beliefs.

178. From February 24, 2021 to September 27, 2021, Plaintiff was deprived of access to fresh air, sunlight, and other basic human needs.

179. While Plaintiff was housed in Allenwood-Special Housing Unit, he forced to go on a food strike for more than six (6) months, including during the holy month of Ramadan, to protest the daily violations of his basic religious and human rights by the Defendants due to his Islamic faith.

180. On March 4, 2021, Defendant Lynch physically assaulted Plaintiff in the presence of Defendant Rung, who sexual harassed Plaintiff. Plaintiff and his lawyers in another case requested the video-recordings of the assault be preserved.

181. On March 4, 2021, Defendants Cooper, Pensyl, Rung, and others confiscated all Plaintiff's clothing, sheets, blankets, towels, socks, shoes, washcloth, and other items and placed him on paper clothing that torned easily, exposing his private parts to his cellmate and others, for six days for retaliatory reasons, with the approval of Defendants Quay, Gibson, Wertman, Hall, and Prutzman.

102. The see-through paper clothing is easily torned while wearing it and provide no protection from a cold cell.

103. As a devout Muslim, Plaintiff must pray five times daily.

104. The Salat (prayer) calls plaintiff to recite verses from the Qur'an accompanied by various bodily postures, including facing Mecca, standing, raising hands, bowing, kneeling, prostrating, sitting, and touching his forehead to the ground.

105. Plaintiff's Islamic faith prohibits him from performing his daily obligatory prayers wearing see-through clothes or while his private parts are exposed.

106. Forcing Plaintiff to wear a see-through clothing that exposed his private parts for six days and deprived him of the ability to perform his daily obligatory salat violated Plaintiff's sincerely held religious beliefs

107. Cleanliness and wearing clean clothes are essential part of the Islamic faith and prayer ritual.

108. For six days, Defendants forced Plaintiff to wear the same dirty and torned paper clothes and deprived him of the ability to take a shower or keep himself clean during the six days was unjustified punishment in violation of his sincerely held religious beliefs.

-21-

109. From March 4, 2021 to March 17, 2021, Defendants Cooper, Pensyl, Rung, Lynch, and Friant deprived Plaintiff from shoes to wear with the approval and knowledge of defendants Quay, Wertman, Hall, and Prutzman.

110. While in the Special Housing Unit, Defendants Cooper, Pensyl, Rung, Lynch, Williams, Friant repeatedly left Plaintiff wearing the same dirty jumpsuit for weeks, denied him clean blanket and sheets for almost two months, and forced to wear torned jumpsuit in violations of his sincerely held religious beliefs which cleanliness and wearing clean cloths are essential of that belief.

111. The Defendants also repeatedly denied Plaintiff cleaning supplies and other needs that they provided to all other inmates in the Special Housing Unit.

112. While Plaintiff was housed in the Special Housing Unit, Defendants Pensyl, Williams, and others repeatedly and deliberately placed the belly chain and handcuffs very tight for the purpose of inflicting severe pain, injuries, and damages to Plaintiff's nerves for no legitimate reasons, other than their hatred toward the Plaintiff and his Islamic faith.

113. Defendants Quay, Wertman, Hall, Prutzman, Buschman, and Hernandez refused to take photographs of the visible injuries, swolling, cuts, redness, and disco-loration caused by the deliberate placement of the restraints very tightly on the Plaintiff.

114. Defendants conspired to cover-up Plaintiff's injuries and refused to correc-tly document them, and refused to provide any medical care for his injuries.

115. Bureau of Prisons Program Statement 5566.06, use of force and application of restraints states that restraints should not be placed on an inmate in a manner which restricts blood circulation or in a manner that causes unnecessary physical pain or extreme discomfort.

116. Plaintiff's medical conditions (peripheral neuropathy, lumbago, severe spinal stenosis, lumbar with neurogenic claudication, carpal tunnel syndrome, and polyneuropathy) were aggravated by the deliberate placement of the restraints very tightly.

117. From July 29, 2021 to August 6, 2021, Defendants Cooper, Pensyl, Rung, Friat, and others deliberately kept Plaintiff in a flooded cell with human waste caused by pluming problems from another cell and they refused to give him clean-ing suppliesor moving him to anyother available cell to inflict pain and suffering upon him and to aggravate his medical conditions.

118. The Islamic faith prohibits the performance of the daily obligatory prayers on flooded or unclean floor, and as a result, plaintiff missed obligatory prayers that islamically required to be performed.

119. While in the Special Housing Unit, numerous times force team was used against Plaintiff based on fabrications by defendant Pensyl to inflict pain and suffering on him and to aggravate his pre-existing medical conditions.

120. While plaintiff was housed at USP-Allenwood and the Special housing Unit, he was repeatedly exposed to OC spray resulting in respiratory symptoms and other symptoms.

121. Shortly after Plaintiff's arrival to USP-Allenwood, Defendant Buschman cancelled a medical order to protect the Plaintiff from exposure to OC spray due to his medical conditions. Defendant Buschman cancelled the order for non-medical reasons.

122. From February 24, 2021 to March 12, 2021, Defendant Cooper deprived Plaintiff of his medical device (INTENSITY 10), resulting in back, spine, and lower body pain.

123. From February 8, 2019 to September 27, 2021, Defendant Quay, Gibson, wertman, Buschman, Shaffer, and Magyer refused to comply wit the terms of pervious settlement agreemnt between the Plaintiff and United States, which includes providing him with cancer preventing food items.

124. From february 24, 2021 to september 27, 2021, defendants Quay, Wertman, Hall, Cooper, Buschman, Magyar, and Hernandez denied Plaintiff access to medically prescribed splints and a brac for his carpal tunnel syndrome.

125. On July 15, 2021, Defendant Cooper deprived Plaintiff of an outside medical trip to a Dermatologist, and as a result, Plaintiff continues to suffer from chronic skin problems.

126. During the period between May 17, 2021 to September 27, 2021, defendants Cooper and Pensyl repeatedly deprived Plaintiff of his medically prescribed Ensure and Almond Milk.

127. While in the Special housing Unit, Defendants Pensyl fabricated numerous incident reports against the Plaintiff based on his religious prejudice toward the Plaintiff and his islamic faith.

128. Defendant Prutzman fabricated an incident report against Plaintiff despite no evidence to support his fabrications.

129. Defendants Easton and Bittenbend conspired with others to find Plaintiff guilty of fabricated and/or retaliatory disciplinary incident reports and imposed severe disciplinary actions against him due to their prejudice toward him and his Islamic faith.

130. While Plaintiff was housed in the Special housing Unit, Defendants Cooper and Prutzman confiscated Plaintiff's Qur'an, religious items, and other property to deprive him of his ability to practice his religion in the manner required by his sincerely held religious beliefs.

140. Defendants Cooper, Pensyl, Rung, Williams, Friant, and others repeatedly offended Plaintiff's Islamic faith and his religious beliefs, subjected him to constant religious harassment, interfered with his ability to practice his religion, encited other inmates to kill or harm him, deprived him of his basic needs, inflicted pain and suffering on him, interfered with his medical needs, and violated his basic human and religious rights.

141. All the Defendants approved, permitted, allowed, condoned, encouraged, covered-up, and/or directly were involved in the violations described in this Complaint.

142. the anti-muslim harassment, abuses, hostility, and actions described in this Complaint and other relevant records constituted a substantial burden on Plaintiff's religious practices because, among other things, they constituted indirect coercion to force Plaintiff to betray his sincerely held religious beliefs. they also prevented him from performing worship acts in the manner required by his religious beliefs without pain, suffering, and unlawful interference. They also deprived him of the ability to receive blessing and reward from Allah, denied him spiritual growth and religious enjoyment, and substantially diminished his qualitative spiritual experience and unlawfully offended his religious beliefs and his Holy books and religious materials.

143. Each of the defendants were responsible for the above described violations and they caused, authorized, allowed, codoned, ratified, approved, or knowingly acquiesced in the illegal actions.

144. the denial of the above described religious freedoms, both individually and combined, resulted in the illegal burdens on Plaintiff's religious rights and fail to further a compelling government interest or otherwise are not the least restrictive means, and they Defendants did not gave Plaintiff's Islamically proper alternative for performing his religious rituals, and worship acts.

### SECOND CLAIM FOR RELIEF
#### (ESTABLISHMENT CLAUSE VIOLATIONS)

145. Plaintiff hereby incorporates all prior paragraphs of this complaint as

if they full set forth herein.

146. The Establishment Clause prohibits, among other things, the government from favoring one religion over another, interfering with religious practices, forcing its own interpretation of religious practice or beliefs on the followers of that religion, or indirectly coercion others to betray their sincerely held religious beliefs.

147. Furthermore, the Establishment Clause prohibits the government officials from punihing a person for enterting or professing religious religious beliefs.

148. The Defendants' described violations, actions, and practices violated plaintiff's rights under the establishment Clause of the First Amendment.

## THIRD CLAIM FOR RELIEF
### (FEDERAL TORT CLAIMS ACT AGAINST UNITED STATES OF AMERICA)

149. Plaintiff hereby incorporates all prior paragraphs of this Complaint as if they fll set forth herein.

150. While at USP-Allenwood, plaintiff was in the care and custody of Defendant United States through its employees.

151. Defendant United States, through its agency BOP, has a duty for the care, well being, safety, protection, and well-being of the prisoners in its custody, including the Plaintiff.

152. Defendant BOP employs all the defendants, who acted as agents for Defendant BOP. As agents of Defendant BOP, they also have duty of care to provide for the well-being of prisoners in Defendant BOP custody, including the Plaintiff.

153. Defendant United States, through its agents, knew of the violations alleged in the Complaint (Deprivation of prescription medications, medically prescriped device device, medically prescribed splints and a brace, medically prescribed ensure and almond milk, deprivation of a proper mattress, failure to follow medical orders to protect from exposure OC spray and respiratory ailments, failure to provide diet, failure to protect from exposure to COVID-19, deprivation of access to fresh air and sunlight, unlawful infliction of pain and injuries due to applying restraints very tightly, failure to provide medical care, denial of basic human needs, assault and infliction of mental and physical pain, place-ment in a cell flooded with human waste and denial of cleaning supplies, and other violations).

153. Defendant United States caused Plaintiff's physical injuries and pain.

154. As a direct and proximate result of the tortious acts and omissions of Defendant United States, Plaintiff suffered damages in an amount to be determind at trial.

## IV. PRAYER FOR RELIEF

Plaintiff respectfully request that this Court enter judgment for him and against each of the Defendants, and award Plaintiff all relief allowed by law, including but not limited to the following:

a) compensatory, nominal, and punitive damages against Defendants named in their individual capacities.

b) expungement of all the retaliatory, religiously motivated, or fabricated disciplinatory action against him and all fabricated reports by the Defendants from the plaintif's records.

c) a declaration that Plaintiff was deprived by Defendants of his constitutional, statutory, and regulatory rights.

d) any further relief that this Court deems just and proper.

## V. DECLARATION

I, Ahmad M. Ajaj, declares under the penalty of perjury, pursuant to 28 U.S.C. 1746, that all the factual allegations in this Complaint are true and correct to the best of my knowledge.

Dated: September 9, 2022.

Respectfully submitted,

Ahmad M. Ajaj#40637-053
USP-Coleman 1
P.O.Box 1033
Coleman, Florida 33521

### CERTIFICATE OF MAILING UNDER THE MAIL-BOX RULE

I, Ahmad M. Ajaj#40637-053, declare under the penalty of perjury, pursuant

28 U.S.C. § 1746, that on Monday September 12, 2022, I delivered the

Complaint to the prison staff, inside pre-paid priority mail postage,

to be mailed to the Clerk of this Court:

Clerk of the Court
U.S. District Court
Middle District of pennsylvania
U.S. Courthouse & Federal Office Building
240 West Third Street, Suit 218
Williamsport, PA 17701

-27-

Case 3:22-cv-01455-MEM-LT   Document 1   Filed 09/19/22   Page 28 of 28

**POSTAL SERVICE**®

**$0.00**

1004    17701    R2305K139876

-09 **IORITY**® **MAIL**

■ Expected delivery date specified for domestic use.

■ Most domestic shipments include up to $50 of insurance (restrictions apply).*

■ USPS Tracking® included for domestic and many international destinations.

■ Limited international insurance.**

■ When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at *http://pe.usps.com.*

** See International Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

**FLAT RATE ENVELOPE**
ONE RATE ■ ANY WEIGHT

**TRACKED ■ INSURED**

**UNITED STATES POSTAL SERVICE**®

**USPS TRACKING #**

9114 9014 9645 0625 7045 13

P14F May 2020
D: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

FROM: AHMAD M. AJAJ
#40637-053 (K-UNIT)
FEDERAL CORRECTIONAL COMPLEX
USP-COLOMAN-1
P.O. BOX 1033
COLEMAN, FLORIDA 33521

RECEIVED
WILLIAMSPORT
SEP 16 2022
PER_____ DEPUTY CLERK

TO:
CLERK OF THE COURT
U.S. DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
U.S. COURTHOUSE & FEDERAL
OFFICE BUILDING
240 WEST THIRD STREET
SUITE 218
WILLIAMSPORT, PA 17701

-LEGAL MAIL-