## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

AHMAD M. AJAJ,                          :

          **Plaintiff**          :     **CIVIL ACTION NO. 3:22-CV-1455**

          **v.**                  :          **(JUDGE MANNION)**

**UNITED STATES**
**OF AMERICA,** *et al.*,                :

          **Defendants**        :

## MEMORANDUM

Presently before the court in this prisoner civil rights case is defendants' motion to dismiss plaintiff's complaint. For the reasons set forth below, the motion will be granted in part and denied in part and plaintiff will be granted leave to file an amended complaint.

## I.  BACKGROUND

Plaintiff, Ahmad M. Ajaj, who is currently incarcerated in USP-Coleman in Coleman, Florida but was incarcerated in FCI-Allenwood in Allenwood, Pennsylvania at all relevant times, brings the instant case pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Religious Freedom Restoration Act ("RFRA"), and the Federal Tort Claims Act ("FTCA") alleging violations of his freedom of religion during his incarceration at FCI-Allenwood. Ajaj filed his complaint on September 12,

2022, and the court received and docketed it on September 19, 2022. (Doc. 1 at 27).

According to the allegations in the complaint, Ajaj is a devout Muslim who practiced his faith during the entirety of his incarceration at FCI-Allenwood. (*Id.* ¶¶ 24-27). The complaint states that during the holy month of Ramadan, Ajaj's Muslim faith requires him to fast from dawn until dusk every day. (*Id.* ¶ 31). This fasting generally prohibits Muslims from ingesting prescribed medication from dawn to dusk, "as long as taking those medications outside of fasting hours will not have an adverse effect on their health." (*Id.* ¶ 35). The complaint states that guidelines published by the United States Bureau of Prisons ("BOP") recognize that Muslims' requests to take their prescribed medication outside of fasting hours during Ramadan should generally be honored. (*Id.* ¶ 38).

Consistent with his Muslim faith and these BOP guidelines, Ajaj requested that BOP officials deliver his prescribed medications—Modafinil and Wellbutrin—to him outside of fasting hours during Ramadan in 2019. (*Id.* ¶ 40). Defendants Gibson, Magyar, Buschman, and Cieslukowski purportedly assured Ajaj prior to Ramadan that they would do so. (*Id.* ¶ 41). At the beginning of Ramadan, however, defendants purportedly "changed their mind" and informed Ajaj that his medication would be delivered during

2

fasting hours. (*Id.* ¶ 42). Ajaj refused to take the medications during fasting hours. (*Id.* ¶ 43). This led defendant Buschman to permanently cancel Ajaj's Modafinil prescription and suspend his Wellbutrin prescription for the duration of Ramadan. (*Id.*)

The complaint alleges that Modafinil had originally been prescribed to treat Ajaj's Chronic Fatigue Syndrome after all other prescribed medications had failed to remedy his symptoms. (*Id.* ¶ 44). The complaint alleges that Modafinil significantly improved Ajaj's symptoms. (*Id.*) The complaint alleges that neither Modafinil nor Wellbutrin should be discontinued suddenly but rather should be gradually reduced before a patient is taken off of them. (*Id.* ¶ 46). Contrary to this fact, however, defendant Buschman allegedly canceled Ajaj's prescriptions suddenly and for non-medical reasons, i.e., Ajaj's refusal to take the medications during the fasting hours. (*Id.*) Buschman also purportedly fabricated medical notes to indicate that he had canceled the prescriptions for medical reasons. (*Id.* ¶ 47). The complaint further alleges that prior to Ajaj's incarceration in FCI-Allenwood, officials in other federal prisons had provided him medication outside of fasting hours during Ramadan without issue. (*Id.* ¶ 50).

The sudden discontinuance of Modafinil and Wellbutrin purportedly caused Ajaj to experience numerous adverse symptoms, including

"uncontrolled agitation and irritability, racing thoughts, headaches, weakness, pain, increased fatigue, unrefreshing sleep, fog brain, short-term memory problems, nervousness, depression, anxiety, and lack of wakefulness." (*Id.* ¶ 53). Ajaj reported the symptoms to defendants Buschman, Magyar, Gibson, and other officials, but they allegedly failed to take any corrective action. (*Id.* ¶ 54). As of the date of the complaint, Ajaj continued to not receive any Modafinil due to Buschman canceling the prescription. (*Id.* ¶ 55). Ajaj repeatedly asked Buschman to reinstate the prescription, but Buschman allegedly refused to do so and blocked other officials from doing so. (*Id.* ¶ 56). Ajaj also purportedly asked defendants Quay, Gibson, Wertman, and Magyar to direct Buschman to reinstate the Modafinil prescription, but they similarly refused to do so. (*Id.* ¶ 57).

The complaint alleges that during Ramadan, Muslims are required to participate in nightly Tarawih prayer with other Muslims. (*Id.* ¶ 58). Defendants Quay, Gibson, Wertman, Hall, and Cieslukowski purportedly prevented Ajaj and other Muslim inmates from participating in the Tarawih prayers during Ramadan in 2019, 2020, and 2021. (*Id.* ¶ 59).

The complaint further alleges that Ajaj's Muslim faith requires him to only eat halal meals. (*Id.* ¶ 60). Defendants Quay, Gibson, Wertman, Cieslukowski, and Shaffer purportedly denied Ajaj's requests to purchase

4

halal meals with his own money during his incarceration in FCI-Allenwood from February 2019 to September 2021. (*Id.* ¶ 62). Defendants Quay, Gibson, Wertman, Cieslukowski, Buschman, Shaffer, and Magyar also denied repeated requests from Ajaj for a halal diet. (*Id.* ¶ 87). Ajaj was purportedly forced to reject all pre-packaged meals because they were not halal, which led Ajaj to have almost nothing to eat from Food Services in the prison. (*Id.* ¶ 88).

According to the complaint, Ajaj's Muslim faith also requires him to participate in periodic Sunnah fasts, which like fasting during Ramadan requires a Muslim to fast from dawn until dusk. (*Id.* ¶ 63-64). Sunnah fasts similarly require Muslims not to ingest medications during fasting hours. (*Id.* ¶ 65). Defendants Quay, Gibson, Wertman, Hall, Buschman, Magyar, and Shaffer purportedly refused to accommodate Ajaj's requests to participate in Sunnah fasts from February 2019 to September 2021 by refusing to deliver his meals or medications outside of fasting hours. (*Id.* ¶ 67)

The complaint alleges that prior to Ajaj's transfer to FCI-Allenwood, the clinical director at FCC-Terre Haute recommended that Ajaj be given a low-fat diet for medical reasons, including "No milk/cheese products. No cereals, soy, cooked grains. No PB, processed meat, vegetable, caffeine. Baked instead of fried foods. White bread-not wheat." (*Id.* ¶ 83). Defendant

5

Buschman purportedly canceled this diet for nonmedical reasons upon Ajaj's arrival at FCI-Allenwood. (*Id.* ¶ 84). Buschman also purportedly "conspired with others" by "fabricating statements under the penalty of perjury to deprive [Ajaj] of halal diet consistent with his medical needs." (*Id.* ¶ 86).

On March 27, 2019, defendant Shaffer allegedly conspired with other individuals to fabricate a declaration for the purpose of denying Ajaj a halal diet. (*Id.* ¶ 89). Ajaj asked defendant Prutzman to preserve video recordings and scanning data from the prison's chow hall that would purportedly establish that the statements in the declaration were fabricated. (*Id.* ¶ 90). Ajaj also asked defendants Quay, Gibson, Wertman, Prutzman, and other individuals to notify the court in another pending civil action that the declaration was fabricated, but they refused to do so. (*Id.* ¶ 91). Defendants' actions purportedly led that court to deny Ajaj's request for a halal diet. (*Id.*)

The complaint alleges that BOP officials, including defendants Quay, Gibson, Wertman, Cieslukowski, Buschman, Shaffer and Magyar, repeatedly provided prepackaged foods to Ajaj that were not halal because they were provided by a company that had been found guilty of mislabeling its products as halal. (*Id.* ¶ 92).

Around September 2020, BOP officials began providing Ajaj with prepackaged meals provided by a company called Labriute Meals. (*Id.* ¶ 96).

The meals had been certified halal by the Islamic Institute of Minnesota. (*Id.* ¶ 97). Because Ajaj had not previously heard of Labriute Meals or the Islamic Institute of Minnesota, he asked defendants Quay, Gibson, Wertman, Cieslukowski, Shaffer, and other BOP officials to contact Labriute Meals and the Islamic Institute of Minnesota to inquire whether their practices were actually halal. (*Id.* ¶¶ 100-01). Defendants refused to do so and instead instructed Ajaj to seek confirmation on his own as to whether the entities complied with halal requirements. (*Id.* ¶ 101).

On January 3, 2021, Ajaj sent a text message to Labriute's halal certifier with eight questions related to the company's practices. (*Id.* ¶ 102). Defendant Valencik, who is responsible for reviewing emails and texts sent by inmates to outside entities, purportedly approved the text message. (*Id.* ¶¶ 103-04). Seven weeks later, however, Ajaj was cited for misconduct for "circumventing monitoring procedures" by sending the text message. (*Id.* ¶ 105). Defendants Quay, Wertman, Hall, Prutzman, and Valencik ordered Ajaj to be transferred to the prison's Special Housing Unit ("SHU") as a result of the misconduct citation. (*Id.* ¶ 111). Other inmates who had been charged with more serious misconduct were purportedly not transferred to the SHU around this time. (*Id.* ¶ 112). Defendant Bittenbend subsequently found Ajaj guilty of the underlying misconduct charge and sentenced him to 60 days of

disciplinary segregation, 18 months loss of visitation privileges, 18 months without email privileges, and 27 days loss of good conduct time. (*Id.* ¶¶ 113-14). Other non-Muslim inmates purportedly received less severe sanctions for more serious offenses during this period. (*Id.* ¶ 115). The resulting limitations on Ajaj's privileges prevented Ajaj from calling or otherwise contacting his mother in the time shortly before she died. (*Id.* ¶ 118).

The complaint additionally alleges that defendants limited Ajaj's access to an imam or a Muslim chaplain. (*Id.* ¶ 130). FCI-Allenwood purportedly hired a Muslim chaplain on September 20, 2020, but defendants Quay, Gibson, Wertman, Hall, Cieslukowski, and Carper[1] denied Ajaj's repeated requests to perform any prayers with the chaplain. (*Id.* ¶ 133). They purportedly also only allowed Ajaj to meet with the chaplain behind a solid steel door in a noisy housing range. (*Id.* ¶ 135). Ajaj, who only has one lung, is purportedly unable to speak loudly enough to communicate in such a setting. (*Id.* ¶ 136). Defendant Bittenbend allegedly directed the chaplain not to visit Ajaj in the SHU. (*Id.* ¶ 137). Ajaj repeatedly requested transfer to another institution where he could have more access to an imam or a Muslim

---

[1] Defendant Carper is named as defendant Cooper in the complaint. The court has granted plaintiff's motion to correct this defendant's name to Carper on the docket of this case. (*See* Doc. 28). The court will accordingly treat any references to "Cooper" in the complaint as references to defendant Carper.

chaplain, but Quay, Wertman, Hall, and Cieslukowski refused to recommend such a transfer. (*Id.* ¶ 138). Ajaj was instead transferred to USP-Coleman, which does not have an imam or Muslim chaplain. (*Id.* ¶ 140). Ajaj accordingly has had no access to an imam or Muslim chaplain since September 27, 2021. (*Id.*)

The complaint alleges that during Ajaj's incarceration in FCI-Allenwood, defendants Quay, Gibson, Wertman, Hall, Cieslukowski, Prutzman, and Carper refused to allow Ajaj or other Muslim inmates to participate in Jum'ah, a congregational prayer that Muslims are supposed to undertake with other Muslims on Fridays. (*Id.* ¶¶ 146-47). Defendants Gibson, Hall, and Cieslukowski also allegedly refused to provide a suitable area for Muslims to perform daily prayers. (*Id.* ¶ 150). Ajaj went on hunger strikes in March 2019 and September 2020 to protest his inability to engage in daily prayer. (*Id.*) On September 21, 2020, defendants Quay, Gibson, Wertman, and Prutzman allegedly filed disciplinary charges against Ajaj and transferred him to the SHU to punish him for requesting transfer to a different cell where he could perform his daily prayers. (*Id.* ¶ 152). Defendants Quay, Wertman, Hall, Cieslukowski, and Carper allegedly deprived Ajaj of access to his prayer rug, prayer oil, and other items he needed to perform his daily prayers, including a watch to know when to perform the prayers. (*Id.* ¶ 153).

9

The complaint alleges that due to his Muslim faith, Ajaj has a sincere religious objection to the practice of strip searches. (*Id.* ¶ 159). Defendants Quay, Gibson, Wertman, Hall, Carper, Pensyl, Rung, Lynch, Williams, and Friant repeatedly denied Ajaj's requests to be free from strip searches and to instead be searched by readily available electronic metal detectors and body scanners. (*Id.* ¶ 163).

During the COVID-19 pandemic, defendants Quay, Gibson, Wertman, Magyar, and Buschman purportedly denied Ajaj's repeated requests to take protective actions to minimize Ajaj's exposure to the virus. (*Id.* ¶ 171). After Ajaj emailed his lawyer and other individuals about the purported refusal by FCI-Allenwood staff to follow COVID-19 guidelines, defendants Quay, Gibson, Wertman, Hall, and others purportedly retaliated against him by expelling him from the "Challenge Program" and placing him with a cellmate who was infected with COVID-19. (*Id.*) Ajaj tested positive for the virus on November 20, 2020. (*Id.* ¶ 173). Ajaj suffered from various symptoms, including "chills, coughing, loss of sense of smell and taste, chest pain, shortness of breath, pain, weakness, fatigue, fog brain, loss of appetite, sore throat, weakness, loss of hearing in one of his ears for a period of time, sore throat, numbness on his face, and other symptoms." (*Id.* ¶ 175). Unnamed defendants purportedly denied him medical care to treat these symptoms.

(*Id.* ¶ 174). The complaint alleges that Ajaj suffers ongoing symptoms from COVID-19, including "serious damage to [his] heart, which includes sever[e]ly hypokinetic." (*Id.* ¶ 176). The complaint additionally alleges that unnamed defendants deprived Ajaj of "fresh air, sunlight, and other basic human needs" from February 24, 2021 to September 27, 2021." (*Id.* ¶ 178).

On March 4, 2021, defendant Lynch allegedly "physically assaulted" Ajaj and defendant Rung allegedly "sexually harassed" him. (*Id.* ¶ 180). On the same day, defendants Carper, Pensyl, Rung, and other individuals allegedly confiscated Ajaj's clothing, sheets, blankets, towels, socks, shoes, washcloth, and other items and compelled him to dress in paper clothing that tore easily. (*Id.* ¶ 181). This was allegedly done for "retaliatory reasons." (*Id.*) The complaint alleges that forcing Ajaj to wear this clothing violated his religious beliefs because it led to his naked body being frequently exposed. (*Id.* ¶ 105).[2] The complaint further alleges that defendants Carper, Pensyl, Rung, Lynch, and Friant deprived Ajaj of shoes to wear from March 4, 2021 to March 17, 2021, with the approval of defendants Quay, Wertman, Hall, and Prutzman. (*Id.* ¶ 109). Defendants Carper, Pensyl, Rung, Lynch, Williams, and Friant purportedly made Ajaj wear the same dirty jumpsuit for

---

[2] The complaint's numbered paragraphs erroneously proceed from 181 to 102 on page 21. The court will cite the paragraph numbers as they appear in plaintiff's complaint.

weeks and denied him clean bedding for almost two months during his time in the SHU. (*Id.* ¶ 110). Defendants also allegedly denied him cleaning supplies that were provided to all other inmates in the SHU. (*Id.* ¶ 111).

Defendants Pensyl, Williams, and others purportedly applied belly chains and handcuffs to Ajaj that were too tight in order to cause him physical pain while he was in the SHU. (*Id.* ¶ 112). Ajaj requested that photographs be taken of the wounds caused by these restraints, but defendants Quay, Wertman, Hall, Prutzman, Buschman, and Hernandez refused to take the photographs. (*Id.* ¶ 113). The complaint alleges the excessively tight restraints exacerbated Ajaj's preexisting medical conditions of "peripheral neuropathy, lumbago, severe spinal stenosis, lumbar with neurogenic claudication, carpal tunnel syndrome, and polyneuropathy." (*Id.* ¶ 116).

From July 29, 2021 to August 6, 2021, defendants Carper, Pensyl, Rung, Friat, and other individuals purportedly compelled Ajaj to remain in a cell that was flooded with human waste and refused to provide him cleaning supplies or move him to another cell. (*Id.* ¶ 117). Ajaj was unable to perform his daily prayers during this time because his Muslim faith requires that he perform them on a clean floor. (*Id.* ¶ 118).

The complaint alleges that defendant Pensyl repeatedly used "force team" against Ajaj while he was in the SHU and that Ajaj was repeatedly

pepper-sprayed while in the unit. (*Id.* ¶¶ 119-20). On one occasion, defendant Buschman purportedly canceled an appointment for Ajaj to receive medical care for exposure to pepper spray for nonmedical reasons. (*Id.* ¶ 121).

The complaint alleges numerous deprivations of medical services and medical prescriptions during the relevant period. From February 24, 2021 to March 12, 2021, defendant Carper allegedly deprived Ajaj of a "medical device," which resulted in pain to Ajaj's back, spine, and lower body. (*Id.* ¶ 122). From February 8, 2019 to September 27, 2021, defendants Quay, Gibson, Wertman, Buschman, Shaffer, and Magyar purportedly refused to comply with a previous settlement between Ajaj and the United States that compelled prison officials to provide Ajaj with "cancer preventing food items." (*Id.* ¶ 123). From February 24, 2021 to September 27, 2021, defendants Quay, Wertman, Hall, Carper, Buschman, Magyar, and Hernandez allegedly deprived Ajaj of medically prescribed splints and a brace for his carpal tunnel syndrome. (*Id.* ¶ 124). On July 15, 2021, defendant Carper allegedly deprived Ajaj of a visit to an outside dermatologist, which allowed Ajaj's "chronic skin problems" to continue. (*Id.* ¶ 125). From May 17, 2021 to September 27, 2021, defendants Carper and Pensyl purportedly deprived plaintiff of medically prescribed Ensure and almond milk. (*Id.* ¶ 126).

The complaint alleges that defendants Pensyl, Prutzman, Easton, and Bittenbend fabricated numerous incident reports against Ajaj. (*Id.* ¶¶ 127-29). Defendants Carper and Prutzman also allegedly confiscated Ajaj's Qur'an and other religious items while he was in the SHU to prevent him from practicing his Muslim faith. (*Id.* ¶ 130).

The complaint asserts claims for violation of Ajaj's right to practice his Muslim religion under the First Amendment and RFRA and a tort claim against the United States pursuant to the FTCA. (*See generally* Doc. 1). Ajaj requests damages, declaratory relief, and injunctive relief requiring expungement of the allegedly wrongful disciplinary charges brought against him. (*See id.* at 26). Defendants moved to dismiss the complaint on May 26, 2023.[3] (Doc. 22). Briefing on the motion is complete and it is ripe for review. (Docs. 34, 43, 49.)

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief may be granted." Under Rule 12(b)(6), the court must "accept all factual allegations as true,

---

[3] The motion was initially styled in the alternative as either a motion to dismiss or a motion for summary judgment. (Doc. 22). In their brief in support of the motion, defendants withdraw the request for summary judgment and clarify that they are only seeking dismissal based on the allegations in the complaint. (Doc. 34 at 1 n.1).

14

construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009 (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plaint statement of the claim, Fed. R. Civ. P. 8(a)(2), and detailed factual allegations are not required, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, *Twombly*, 550 U.S. at 555, and a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

In resolving a motion to dismiss, the court thus conducts "a two-part analysis." *Fowler*, 578 F.3d at 210. First, the court separates the factual elements from the legal elements and disregards the legal conclusions. *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.* at 211 (quotations omitted).

15

Courts must liberally construe complaints brought by *pro se* litigants. *Sause v. Bauer*, 585 U.S. 957, 960 (2018). *Pro se* complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## III.   DISCUSSION

### A.   Motion to Dismiss

Defendants advance four arguments for dismissal: (1) that defendant Buschman is immune from suit as a member of the Public Health Service pursuant to 42 U.S.C. §233(a); (2) that all individual defendants are entitled to qualified immunity from Ajaj's claims; (3) that Ajaj's *Bivens* claims are an impermissible extension of the *Bivens* damages remedy; and (4) that Ajaj's FTCA claim fails as a matter of law because it is based exclusively on conclusory allegations.[4]

The court begins, as it must, by disregarding the allegations in the complaint that are conclusory in nature and therefore not entitled to the

---

[4] Defendants' brief also argues that the FTCA claim should be dismissed for Ajaj's failure to file a certificate of merit to the extent the claim is based on allegations of medical malpractice. Defendants correctly concede in their reply brief, however, that a subsequent Third Circuit case, *Wilson v. United States*, 79 F.4th 312, 316 (3d Cir. 2023), holds that certificates of merit are not required for FTCA claims. (Doc. 49 at 14). The court accordingly disregards this argument.

assumption of truth. *Fowler*, 578 F.3d at 210-11. The court finds the following allegations to be conclusory and not entitled to the assumption of truth: (1) that Buschman fabricated medical notes to indicate that he was canceling Ajaj's prescriptions for medical reasons, (Doc. 1 ¶ 47); (2) that Buschman, Shaffer, and others fabricated statements to deprive Ajaj of a halal diet, (*id.* ¶ 86, 89); (3) that Quay, Gibson, Wertman, and Prutzman fabricated misconduct charges against him to punish him for requesting transfer to another institution, (*id.* ¶ 152); (4) that Quay, Gibson, Wertman, Magyar, and Buschman denied Ajaj's requests to take action to protect Ajaj from COVID-19, (*id.* ¶ 171); (5) that defendants denied him medical care to treat his COVID-19 symptoms, (*id.* ¶ 174); (6) that defendants deprived Ajaj of "fresh air, sunlight, and other basic human needs," (*id.* ¶ 178); (7) that Lynch "physically assaulted" Ajaj and that Rung "sexually harassed him," (*id.* ¶ 180); (8) that Pensyl repeatedly used "force team" against Ajaj, (*id.* ¶ 119); (9) that Buschman canceled an appointment for Ajaj to receive medical care for exposure to pepper spray, (*Id.* ¶ 121); (10) that Carper deprived Ajaj of a "medical device," (*id.* ¶ 122); (11) that Quay, Gibson, Wertman, Buschman, Shaffer, and Magyar refused to comply with a settlement agreement in an unnamed case requiring prison officials to provide Ajaj "cancer preventing food items," (*id.* ¶ 123); (12) that Carper deprived Ajaj of a visit to a

dermatologist, which exacerbated his "chronic skin problems," (*id.* ¶ 125); and (13) that Pensyl, Prutzman, Easton, and Bittenbend fabricated numerous incident reports against Ajaj, (*id.* ¶¶ 127-29).

Once those conclusory allegations are stripped away, the court liberally construes the complaint as alleging that defendants violated the First Amendment and RFRA by refusing to provide Ajaj medication outside of fasting hours during Ramadan and Sunnah fasts, preventing him from engaging in Tarawih prayer during Ramadan, preventing him from eating a halal diet, fabricating misconduct charges against him based on his attempts to contact Labriute Meals, preventing him from consulting with an imam or a Muslim chaplain, preventing him from engaging in Jum'ah prayers, preventing him from engaging in daily prayers, compelling him to be strip searched, compelling him to wear paper clothing, and depriving him of his Qur'an. The court additionally liberally construes the complaint as alleging violation of the FTCA based on Buschman discontinuing—and refusing to reinstate—Ajaj's prescriptions for Modafinil and Wellbutrin; Buschman depriving him of a medically necessary low-fat diet; Pensyl and Williams applying restraints that were too tight; and Quay Wertman, Hall, Carper, Buschman, Magyar, and Hernandez denying him the use of medically

18

necessary splints and a brace. The court will analyze defendants' arguments for dismissal *seriatim*.

### 1.    Claims Against Buschman

The court begins its analysis with defendant Buschman's argument that he is entitled to immunity from Ajaj's claim pursuant to 42 U.S.C. §233(a) because the claims arise from medical care he provided to Ajaj in his official capacity as an officer of the United States Public Health Service ("PHS"). (Doc. 34 at 23-24).

The court agrees that defendant Buschman is entitled to absolute immunity from Ajaj's claims pursuant to Section 233(a). Section 233(a) "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010). Immunity under Section 233(a) may be raised in a motion to dismiss, and the defendant may establish that he was acting as a PHS officer by filing "a declaration affirming that the defendant was a PHS official during the relevant time period." *Id.* at 802 n.1, 811. Here, Buschman has filed a declaration affirming that he was acting as a PHS officer, and it is clear from the complaint that the claims against him

are based on decisions he made in that capacity. The court will accordingly

dismiss all claims against Buschman pursuant to 42 U.S.C. §233(a).

### 2.    FTCA Claims Will Be Dismissed for Failure to Exhaust[5]

Before asserting an FTCA claim in federal court a plaintiff must first

exhaust administrative remedies. 28 U.S.C. §2675(a); *Shelton v. Bledsoe*,

775 F.3d 554, 569 (3d Cir. 2015). Exhaustion under the FTCA is jurisdictional

and cannot be waived. *Shelton*, 775 F.3d at 569. FTCA claims should

therefore be dismissed for lack of subject matter jurisdiction when the

plaintiff's complaint fails to allege that he exhausted administrative remedies.

*See, e.g.*, *McClure v. Fed. Bureau of Prisons*, No. 1:23-CV-1060, 2023 WL

8437047, at *3 (M.D. Pa. Dec. 5, 2023); *Geiger v. United States of America*,

No. 3:23-CV-1079, 2023 WL 3136405, at *4 (M.D. PA. April 27, 2023); 35A

Am. Jur. 2d *Federal Tort Claims Act* §209, Westlaw (database updated May

2024). Courts should generally grant the plaintiff leave to amend to cure the

---

[5] Defendants' motion to dismiss does not argue that Ajaj failed to exhaust administrative remedies with respect to his FTCA claims. The court may nevertheless raise the issue of exhaustion *sua sponte* pursuant to its screening authority under 28 U.S.C. §1915A. Furthermore, because exhaustion of administrative remedies under the FTCA is a jurisdictional issue that cannot be waived, this court is obligated to consider the issue *sua sponte. See Fort Bend Cty., Tex. v. Davis*, 587 U.S. 541, 548 (2019) (noting that federal courts are continually obligated to review whether they have subject matter jurisdiction and must raise subject matter jurisdiction issues *sua sponte*).

absence of allegations as to exhaustion of administrative remedies before ultimately dismissing the claims. *Id.*

In this case, Ajaj's complaint is completely silent as to his attempts to exhaust administrative remedies on his FTCA claims. There are simply no allegations from which it can be concluded or inferred that he exhausted administrative remedies. Accordingly, the court will dismiss Ajaj's FTCA claims without prejudice for lack of subject matter jurisdiction and grant leave to amend to allege facts showing that he exhausted administrative remedies.

### 3.   Ajaj's *Bivens* Claims Are Not Cognizable

Ajaj's First Amendment claims are filed pursuant to *Bivens*, 403 U.S. at 388. *Ziglar v. Abbasi*, 582 U.S. 120 (2017) and its progeny significantly limit the circumstances under which a *Bivens* claim may proceed. Under *Abbasi*, courts considering a *Bivens* claim must first determine whether the claim presents a "new context" for a *Bivens* claim, in other words, whether it differs "in a meaningful way" from the three cases in which the Supreme Court has explicitly recognized a *Bivens* remedy in the past—*Bivens*, 403 U.S. at 397, *Davis v. Passman*, 442 U.S. 228, 248-49 (1979), and *Carlson v. Green*, 446 U.S. 14, 18-23 (1980). *Abbasi*, 582 U.S. at 138-39.

If the case presents a new context, the court must determine whether any "special factors" counsel against extending a *Bivens* remedy to that

context. *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020). To conduct this analysis, the court must determine whether "the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (quoting *Abbasi*, 582 U.S. at 136). If a court concludes that "even a single reason" exists to pause "before applying *Bivens* in a new context," then special factors counseling hesitation exist and a *Bivens* remedy does not lie. *Id.* (quoting *Hernandez*, 589 U.S. at 102) (internal quotation marks omitted). If there is "*any* rational reason (even one) to think that *Congress* is better suited" to determine the propriety of a cause of action, then a *Bivens* action cannot proceed. *Id.* at 496. The court must broadly inquire whether "there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate'"—and if the answer is "yes," or even *potentially* yes, the plaintiff cannot recover under *Bivens. Id.*

In this case, Ajaj's *Bivens* claims allege violations of his First Amendment right of freedom of religion. These claims clearly present a new context for *Bivens* liability. As the United States Court of Appeals for the Third Circuit has recognized, "neither the Supreme Court nor this Court has ever extended *Bivens* to Free Exercise claims." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016).

It is also clear that special factors counsel against extending *Bivens* to this new context. The Supreme Court has recognized that "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*, 582 U.S. at 145. "If there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Egbert*, 596 U.S. at 493 (citing *Abbasi*, 582 U.S. at 137). In this case, RFRA is an alternative remedial structure that counsels against extending *Bivens* to the free exercise context. As the Third Circuit has explained:

> RFRA strongly militates against creating a *Bivens* action for Free Exercise claims. . . . RFRA provides [a plaintiff] with a comprehensive remedial scheme for violations of substantial burdens on his religious exercise. Indeed, "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." Under RFRA, burdens on religious exercise need not be intentional, only substantial. And, as we have explained, RFRA provides claimants with all "appropriate relief" for such violations. Given this alternative remedial scheme, we can conceive no adequate justification for extending *Bivens* to Free Exercise claims.

*Mack*, 839 F.3d at 305. Accordingly, because Ajaj's *Bivens* claims present a new context for *Bivens* liability and RFRA is an alternative remedy for the claims that strongly militates against extending the *Bivens* remedy, we will dismiss the *Bivens* claims with prejudice as an impermissible extension of *Bivens*.

### 4. RFRA Claims

"RFRA prohibits the 'Government from substantially burdening *a* person's exercise of religion even if the burden results from a rule of general applicability' unless the Government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014) (cleaned up) (quoting 42 U.S.C. §2000bb-1). To state a prima facie RFRA claim, a plaintiff "must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise." *Davis v. Wigen*, 82 F.4th 204, 211 (3d Cir. 2023) (quoting *Mack*, 839 F.3d at 304). At the pleading stage, the court must only inquire whether plaintiff has alleged these elements. *Id.* Once the case moves to summary judgment or a trial, however, "if the plaintiff makes an initial showing that the defendant substantially burdened his sincere religious exercise, then the burden shifts to the defendant to show that the offending policy is the least restrictive means of achieving a compelling government interest." *Id.* A substantial burden occurs when "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a

benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Id.* (quoting *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007)).

In this case, defendants argue that Ajaj's RFRA claims should be dismissed on the basis of qualified immunity because Ajaj has not alleged violations of RFRA and the rights that defendants allegedly violated were not clearly established at the time of the alleged conduct. (Doc. 34 at 24-40).

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The test is whether, on an objective basis, no reasonable, competent official would have reached the same conclusion as was reached by the defendant. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If officials of reasonable competence could disagree on this issue, immunity should be recognized. *Id.* Even if the official's conduct violates a person's constitutional rights, the official would be immune from liability if his conduct were due to a mistake in judgment. *Id.*; *Butz v. Economu*, 438 U.S. 478 (1978). Thus, the only inquiry which must be undertaken is a question of law, that is: "the objective (albeit fact-specific) question" whether a reasonable official in the defendant's

25

position in this case could have believed his actions "to be lawful, in light of clearly established law and the information . . . [he] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48 (2018) (cleaned up). For qualified-immunity purposes, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted).

Defendants assert that Ajaj fails to allege a violation of RFRA and that any violation of RFRA was not based on a clearly established right. (Doc. (Doc. 34 at 24-40). Defendants organize their argument into several discrete arguments based on the individual actions on which Ajaj bases his RFRA claim. (*See id.*) Defendants also argue that numerous defendants were not personally involved in the alleged violation of Ajaj's civil rights. (*See id.*)

The court finds that defendants are not entitled to qualified immunity at this stage of litigation. As the court liberally construes the complaint, Ajaj alleges a concerted effort by defendants to essentially ban him from any

26

practice of his Islamic faith. The court does not view the complaint as alleging a RFRA violation based on the purported denial of Ajaj's right to fast during Ramadan, a second RFRA violation based on the deprivation of a halal diet, etc. Rather, the court views the complaint as alleging that defendants committed a single violation of RFRA by essentially banning him from practicing his Muslim religion. Each factual instance in which defendants purportedly restricted one aspect of Ajaj's faith is simply an additional factual allegation in support of the overarching theory that defendants violated RFRA by essentially banning Ajaj from practicing his faith.

This alleged severe limitation on Ajaj's ability to practice his Muslim faith is sufficient to allege a violation of a clearly established right under RFRA. "There can hardly be a more substantial burden on a religious practice or exercise than its outright prohibition." *Davis*, 82 F.4th at 212 (citing *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014). "While not every government-imposed hurdle to the practice of sincere faith-based conduct will be a substantial burden, the more proximate the government action is to an outright bar, the more likely it is a substantial burden." *Id.* Because Ajaj alleges severe limitations on the practice of his religion that can be liberally construed as essentially banning him from practicing the religion, the court finds that he has stated a RFRA claim upon which relief

27

may be granted and that defendants are not entitled to qualified immunity from the claim.

The court agrees with defendants, however, that the RFRA claim should be dismissed against defendants Magyar, Hernandez, and Easton for Ajaj's failure to allege their personal involvement.[6] The only allegations against Magyar, Hernandez, and Easton are either conclusory assertions that are not entitled to the assumption of truth or relate to the FTCA claims that the court has found are otherwise subject to dismissal. The court will accordingly dismiss the claims against these defendants without prejudice for failure to allege personal involvement.

## B.   Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile. *Phillips*, 515 F.3d at 245. The court will deny leave to amend as futile with respect to Ajaj's claims against defendant Buschman and his *Bivens* claims against all defendants because those claims fail as a matter of law. The court will grant Ajaj leave to amend his complaint in all other respects.

---

[6] The court finds that the complaint adequately alleges the personal involvement of all other defendants in the RFRA claim.

## IV.   CONCLUSION

For the foregoing reasons, the court will grant defendants' motion to dismiss in part and deny it in part, allow Ajaj's RFRA claim to proceed, dismiss his claims against defendant Buschman and his *Bivens* claims against all defendants with prejudice, dismiss all other claims without prejudice, and grant Ajaj leave to file an amended complaint. An appropriate order shall issue.

**Malachy E. Mannion**
**United States District Judge**

**Dated:**  7/31/24

29